IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:22 CV 65 MR WCM

| | |
|---|---|
| KIM SHOOK, KYLIE SCOLARO-CONTI, and JOHN SZWYD, <br><br> Plaintiffs, <br><br> v. <br><br> NCG ACQUISITION, LLC d/b/a APPALACHIAN COMMUNITY SERVICES and NCG CARE, INC. a/k/a ncgCARE, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **MEMORANDUM AND RECOMMENDATION** |

This matter is before the Court on a Motion to Dismiss (Doc. 9) filed by NCG Acquisition, LLC d/b/a Appalachian Community Services ("NCG Acquisition") and NCG Care, Inc., a/k/a ncgCARE ("NCGCare") (collectively "Defendants"). The Motion has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

## I. Relevant Procedural Background

On March 24, 2022, Kim Shook ("Shook"), Kylie Scolaro-Conti ("Scolaro"), and John Szwyd ("Szwyd") (collectively "Plaintiffs") filed their Complaint. Doc. 1.

Defendants filed the Motion to Dismiss along with a supporting memorandum on May 10, 2022. Docs. 9, 10

Plaintiffs have responded in opposition and Defendants have replied. Docs. 12, 14.

A hearing on the Motion to Dismiss was conducted on November 2, 2022.

## II. Plaintiffs' Allegations

In pertinent part, Plaintiffs allege as follows:

Defendants offer behavioral healthcare, mental health, substance abuse, and developmental disability services. Doc. 1 at ¶ 15. Jessica Tewell ("Tewell") serves as Defendants' Assistant Director of Outpatient and Community-Based Services. Id. at ¶ 25. Ron Ross ("Ross") is Defendants' Regional Director. Id. at ¶ 33. Both Tewell and Ross are "licensed substance abuse professionals." Id. at ¶ 15.

Plaintiffs are "licensed substance abuse counselors" and were employed by Defendants in North Carolina. Doc. 1 at ¶¶ 1, 16.[1] Plaintiffs' responsibilities included coordinating, providing, and maintaining substance abuse treatment and recovery services. Id at ¶ 16. Plaintiffs were also members of the Substance Abuse Intensive Outpatient Program Team (the "Team"), which monitored

---

[1] The Complaint alleges that subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1332. Doc. 1-1 at ¶ 11. Plaintiffs do not, however, assert any federal claims. With respect to diversity jurisdiction, it appears that the parties are completely diverse. Id. at ¶¶ 4-8.

client progress, engaged in crisis intervention, and "assess[ed] the required level of patient care (e.g., outpatient vs. inpatient) during a crisis." Id. at ¶ 17. As part of the Team, Plaintiffs were required to make safety assessments so that clients would have the appropriate level of care; for patients in drug addiction treatment, this care often included "intervention with probation officers and recommendations for hospitalization and detoxification, also known as higher levels of care." Id. at ¶ 18.

On March 22, 2021, Shook received a phone call from a client who was in distress. Id. at ¶ 21. Shook spoke to the client by phone for an extended period. Id. at ¶ 22.

Shook sought guidance from Scolaro, who was the client's therapist on the Team, and Shook and Scolaro attempted to develop a crisis treatment plan with the client. The client refused to attend mobile crisis treatment immediately and, therefore, inpatient hospitalization was clinically indicated. Id. at ¶ 23.

After receiving the client's consent, Shook contacted the client's probation officer who advised that he needed a letter from the Team "to present to the federal court" showing that the client had been discharged from the Team and that inpatient hospitalization was recommended. Id. at ¶ 24.

Shook and Scolaro alerted Szwyd, who was their clinical supervisor, and the three of them agreed that Scolaro would send a letter to Tewell for her approval and co-signature, pursuant to "Agency policy." Id. at ¶ 25.

Scolaro drafted and sent a letter to Tewell on March 25, 2021 (the "Letter"). Id. at ¶ 26.

Plaintiffs allege that between March 25, 2021 and April 2, 2021, the Team, through multiple communications, attempted to get Tewell to approve and co-sign the Letter but that Tewell refused. Id. at ¶ 28. Plaintiffs further allege that Tewell removed important clinical information from the Letter, replaced that information with "false and inaccurate clinical information," and changed the Team's recommendation from a "higher level of care" to a "different level of care," which was not clinically indicated. Id. at ¶ 27.[2]

On Friday, April 2, 2021, the client's probation officer contacted Shook about the status of the Letter. Id. at ¶ 29. Tewell still would not agree to the required language and Shook sent the Letter to the client's probation officer after hours on Friday without the language Shook believed was appropriate. Id.

---

[2] Plaintiffs allege that "[u]nder the standards promulgated by the American Society of Addiction Medicine (ASAM), a 'higher of level of care'" would have resulted in residential/inpatient hospitalization. Doc. 1 at ¶ 27.

4

The following Monday, April 5, 2021, the client died of an overdose. The client's probation officer informed Shook of this information on Friday, April 16, 2021. Id. at ¶¶ 30-31.

Szwyd advised Tewell about the client's death and that Shook would be completing "the report." Id. at ¶ 32. Tewell, however, completed and finalized the report herself without conferring with Shook and despite having no firsthand knowledge of the underlying events. Id.

On April 19, 2021, Szwyd complained to Ross and explained that the Team believed Tewell's refusal to approve the recommendation for a higher level of care was contraindicated and may have contributed to the client's death. Id. at ¶ 33. Szwyd further stated that "the Counselors" wanted to prevent a similar event from happening again and preferred to resolve the issue internally. Ross responded by warning Szwyd to "watch his rhetoric." Id. at ¶¶ 33-34.

Subsequently, Szwyd sent Ross copies of internal messages among the Team showing in real time "the frustration and obstacles" the Team had faced in trying to get Tewell to approve its recommendation. Id. at ¶ 36.

The next day, Ross informed Szwyd that Ross would be referring the matter to someone Ross knew "within the organization" for further investigation. Id. at ¶ 37.

On April 28, 2021, Defendants' Senior Director of Human Resources, Diversity, Equity, and Inclusion Nicole Gamble ("Gamble") asked Plaintiffs to meet with her individually. Plaintiffs believed that Gamble wanted to gather more information about their concerns. Id. at ¶ 38.

Instead, Gamble informed Plaintiffs that their employment was being terminated because the internal messages they had submitted in support of their complaint against Tewell constituted violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Id. at ¶ 39.[3] A subsequent corrective action report, which documented the reasons for Plaintiffs' termination, did not mention HIPAA but stated that the internal messages had "caused concern." The corrective action report also faulted Plaintiffs for their general "attitude observed toward the discussion about the clinical care of the client" and "disregard for following protocols." Id. at ¶ 41.[4]

On August 9, 2021 (more than three months after their terminations), Plaintiffs filed a complaint with the North Carolina Department of Health and Human Services ("NC DHHS"). Id. at ¶ 44.

In response, the Mental Health Licensure and Certification Section of NC DHHS conducted an unannounced investigation of Defendants' facilities,

---

[3] The undersigned reads the Complaint to say that Plaintiffs' terminations occurred on April 28.

[4] Plaintiffs allege that when they asked for copies of the "policies" they allegedly disregarded, "the Agency refused to provide them." Doc. 1 at ¶ 42.

and then, on October 4, 2021, issued a report. Id. at ¶¶ 45-46. Plaintiffs allege

that the report found a "Type A 1 rule violation…for serious neglect" because

> [Tewell] failed to demonstrate competency – she failed to sign a letter for [the deceased Client] that was requested by probation and forwarded to her by Substance Abuse Intensive Outpatient Program ("SAIOP") staff referencing a need for a higher level of care for 7 business days, from 3/22/21-4/2/21 and edited information in the letter; the edited information included inaccuracies regarding lack of progress in the program, and a recommendation for a different service that was not recommended by the clinicians; [Tewell] based her edits upon review of the client record. She had never met [the deceased Client].

> Id. at ¶ 46.[5]

Plaintiffs' Complaint asserts claims for wrongful discharge in violation

of public policy and intentional infliction of emotional distress.

## III.   Legal Standards

When considering a motion made pursuant to Rule 12(b)(6), the court,

accepting the allegations in the complaint as true and construing them in the

light most favorable to the plaintiff, determines "whether the complaint on its

face states plausible claims upon which relief can be granted." Francis v.

---

[5] A copy of the NC DHHS report does not appear in the record. During the November 2, 2022 hearing, Defendants stated that the findings of the NC DHHS report had been appealed and modified. A copy of that subsequent decision has been filed. See Doc. 16-1.

Giacomelli, 588 F.3d 186, 189, 192 (4th Cir. 2009); accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).

The court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see Giacomelli, 588 F.3d at 192. That is, while "detailed factual allegations" are not required, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); accord Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); accord Consumeraffairs.com, 591 F.3d at 255. In short, the well-pled factual allegations must move a plaintiff's claim from conceivable to plausible. Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

## IV. Materials Considered

Defendants have attached to their Motion to Dismiss "Google Chat" messages (Doc. 10-1), which Defendants contend are the "internal messages" referenced by Plaintiffs' Complaint, as well as an email chain (Doc. 10-2), which they assert reflects communications between Plaintiffs and Tewell between March 25, 2021 and April 2, 2021 regarding the Letter. See Doc. 10 at

8

6 n. 5; 8 n. 10. Defendants argue that these materials are integral to the Complaint and have been put "in play" by Plaintiffs such that they may be considered in the context of the Motion to Dismiss. Doc. 10 at 2 n. 2. Plaintiffs disagree and contend that Defendants have "made it nearly impossible for Plaintiffs to respond" to these extrinsic communications without turning the Motion to Dismiss into a motion for summary judgment. Doc. 12 at 1.

Generally, in the context of a motion made pursuant to Rule 12(b)(6), "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Brentzel v. Fairfax Tansfer and Storage, Inc., No. 21-1025, 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (citing Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001)). A court may, however, consider a document that is "integral to and explicitly relied on in the complaint" when the document's authenticity is not disputed. Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999). For the document to be considered, "the plaintiff's claims must turn on, or otherwise be based on, the contents of the document." Brentzel, 2021 WL 6138286, at *2 (citing Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016)). "Short of that, a document is not integral to the complaint and should not be considered." Id.

Here, assuming that the authenticity of the Google Chat messages and email chain is not disputed, the undersigned is not persuaded that these documents should be considered at this stage. Though the documents may be relevant to the case and provide details about some of the pertinent communications between the parties, Plaintiffs' claims do not sufficiently turn on the contents of these various documents themselves to justify their use in connection with the Motion to Dismiss.

Therefore, the undersigned has not relied on the Google Chat messages or email chain (Docs. 10-1, 10-2) in analyzing the Motion to Dismiss. See Wards Corner Beauty Academy v. National Accrediting Commission of Career Arts & Sciences, No. 2:16cv639, 2017 WL 11509750, at *1 (E.D. Va. June 15, 2017) ("Defendant's efforts to utilize such documents invites the Court to consider the strength of the parties' competing evidence and make merits-based rulings that should not be issued at the 12(b)(6) stage").

V. Discussion

A. Wrongful Discharge in Violation of Public Policy

Under North Carolina law, an employer generally may terminate an at-will employment relationship for any reason, or no reason at all. Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 568-572 (1999); see also Belton v. Dodson Brothers Exterminating Company, Inc., No. 1:09cv106, 2009 WL 3200035 (M.D.N.C. Sept. 30, 2009) ("in the absence of a contractual agreement

10

between an employee and an employer establishing a definite term of employment, the relationship is terminable at the will of either party without regard to the quality of performance of either party").

However, North Carolina courts have recognized a limited exception to the employment-at-will rule; an at-will employee may bring a claim for wrongful discharge when the employee's dismissal occurred "for a reason that violates public policy." Considine v. Compass Group USA, Inc., 145 N.C.App. 314, 317, aff'd, 354 N.C. 568 (2001). This exception "is a very narrow one". Griggs v. Casual Corner Group, Inc., No. No. 3:02CV277, 2005 WL 1983888 at *12 (W.D.N.C. Aug. 10, 2015) (collecting cases); see also Kurtzman v. Applied Analytical Industries, Inc., 347 N.C. 329, 333–34 (1997) ("[t]he narrow exceptions to [the employment at will doctrine] have been grounded in considerations of public policy designed either to prohibit status-based discrimination or to insure the integrity of the judicial process or the enforcement of the law").

A plaintiff seeking to assert such a wrongful discharge claim is required to point to conduct by a defendant "that violated a specific expression of North Carolina public policy." Considine, 145 N.C. App. 321-322.

### 1. The Public Policy Cited by Plaintiffs

The North Carolina Supreme Court has noted that public policy has been defined "as the principle of law which holds that no citizen can lawfully do that

which has a tendency to be injurious to the public or against the public good." Coman v. Thomas Manufacturing Co., 325 N.C. 172, 175 n. 2 (1989).

In their Complaint, Plaintiffs cited portions of a group of regulations found in the North Carolina Administrative Code entitled "Ethical Principles of Conduct for the Substance Abuse Professional" 21 N.C.A.C. § 68.0500 *et seq.* (the "Ethical Principles") See Doc. 1 at ¶ 50 (citing 21 N.C.A.C. § 68.0507 (regarding client welfare); 21 N.C.A.C. § 68.0503(a) ("The substance use disorder professional shall employ their knowledge, skill and proficiencies within their scope of practice"); 21 N.C.A.C. § 68.0503(h) ("The substance use disorder professional shall complete reports and record keeping functions in a manner that supports the client's treatment experience and welfare")).[6]

In their principal brief supporting the Motion to Dismiss, Defendants argued that expressions of North Carolina public policy cannot be set forth only in the Administrative Code. See Doc. 10 at 19-20.

Subsequently, in their opposition to the Motion to Dismiss and during the November 2 hearing, Plaintiffs cited the North Carolina Substance Use Disorder Professional Practice Act, N.C.G.S. § 90-113.30, *et seq.* (the

---

[6] Plaintiffs also cited a "Code of Ethics" published by the Association for Addiction Professionals. See Doc. 1 at ¶ 52; see https://www.naadac.org/code-of-ethics (last visited 11/22/2022). Plaintiffs, though, have not provided authorities that indicate this Code of Ethics has been made a part of North Carolina law.

"SUDPPA") and the following additional provisions from the Ethical Principles:

> The substance use disorder professional shall assist in eliminating prevention, intervention, treatment, and supervision practices by persons unqualified or unauthorized to practice in the field.
>
> 21 N.C.A.C. § 68.0503(d)
>
> _____
>
> The substance use disorder professional who knows of unethical conduct, as defined by the rules of this Chapter, by a substance use disorder professional shall report such violations to the Board.
>
> 21 N.C.A.C. § 68.0503(e).

In their reply, Defendants argued that Plaintiffs are prohibited from relying on the SUDPPA and the additional portions of the Ethical Principles since those authorities were not cited in Plaintiffs' Complaint. See Doc. 14 at 2.

"It is well-established that parties cannot amend their complaints through briefing or oral advocacy." So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013).

Here, however, the undersigned believes that it is appropriate to consider the SUDPPA as well as the additional portions of the Ethical Principles cited by Plaintiffs. Expressions of public policy have been found in North Carolina statutes, the state constitution, and state regulations. See

13

Coman, 325 N.C. at 176 (discussing the public policy of North Carolina relative to highway safety "as established in the Administrative Code"); Hurth v. Bradman Lake Group Ltd., No. 3:08 CV 370–MR–DSC, 2009 WL 2497993, at *6 n. 2 (W.D.N.C. Aug. 14, 2009) (noting that North Carolina courts have looked to North Carolina statutes, the state constitution, and state regulations to identify "public policy" for purposes of the tort of wrongful discharge in violation of public policy)). Further, though Plaintiffs' Complaint did not specifically reference the SUDPPA, that pleading did refer to Sections 503 and 507 of the Ethical Principles and the Ethical Principles themselves were developed pursuant to the authority granted by the SUDPPA. See N.C.G.S. § 90-113.33. Finally, as the parties presented arguments orally during the November 2, 2022 hearing, Defendants have been given the opportunity to be heard on any points raised in Plaintiffs' reply.

## 2. The Parties' Positions

As discussed in more detail below, Plaintiffs allege that their terminations violated the public policy they have identified. In particular, Plaintiffs contend that Tewell's conduct was not professionally competent, that they were required to report that conduct, and that they were terminated for doing so. See Doc. 1 at ¶ 57 (alleging that under North Carolina law, Plaintiffs were "obligated" to make their complaint about Tewell, and that Plaintiffs were terminated based on that complaint).

14

No party has provided case law that considers whether North Carolina has expressed a public policy involving reporting requirements for substance use disorder professionals. Likewise, the undersigned's own research has not located such authorities.

The parties' arguments therefore center on case law interpreting other expressions of public policy which the parties contend are analogous and should guide the Court as it considers the Motion to Dismiss.

### a. The NCEEPA and Claims of Retaliatory Discharge

Defendants rely heavily on case law that involves the scope of North Carolina's public policy as expressed in the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.1, *et seq.* (the "NCEEPA"), and argue that North Carolina law does not allow a claim for wrongful discharge based on "retaliatory discharge." See Doc. 10 at 17-19.

The NCEEPA declares that the public policy of North Carolina is to "protect...the right ...[to] hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap...." Courts have interpreted this policy to allow a plaintiff to bring a claim for wrongful discharge where the plaintiff contends that he or she has been discharged on account of race, religion, color, national original, age, sex, or handicap. See e.g. McLean v. Patten Communities, Inc., 332 F.3d 714, 721 (4th Cir. 2003); Hughes v. Bedsole, 48 F.3d 1376, 1383–84 (4th Cir. 1995);

Hughes v. Hewlett Packard Corp., No. 3:07–CV–216, 2008 WL 4372794, *2 (W.D.N.C. Sept.22, 2008); Simmons v. Chemol Corp., 137 N.C.App. 319, 322 (2000); McCullough v. Branch Banking & Trust Co., 136 N.C.App. 340, 346 (2000).

Courts have also reasoned, however, that the public policy expressed in the NCEEPA does not prohibit alleged retaliation for *reporting* or *opposing* discriminatory conduct. See Ramos v. Carolina Motor Club, Inc., No. 3:17-cv-00212-RJC-DSC, 2018 WL 3040028, at *11 (W.D.N.C. June 19, 2018) (stating that the NCEEPA "'expresses the policy of North Carolina with respect to employment discrimination on account of race, religion, color, national origin, age, sex or handicap. It does not express a public policy concerning harassment, failure to promote or retaliation'") (quoting Chung v. BNR, Inc., 16 F.Supp.2d 632, 634 (E.D.N.C. 1997)); Ricketts v. Logics, LLC, No. 5:15-CV-293-D, 2017 WL 4293406, at *8 (E.D.N.C. Sept. 27, 2017) (granting summary judgment to defendant on plaintiff's claim that she was terminated in retaliation for her complaints about her coworker's racially insensitive comments because the NCEEPA did not "create a private right of action for retaliation or provide a source of public policy concerning retaliation") (collecting cases)); Leach v. Northern Telecom, Inc., 141 F.R.D. 420, 426 (E.D.N.C. 1991) (reasoning that North Carolina had no "written public policy…with respect to *retaliation for opposing sexual discrimination in the workplace*" and therefore there was no

recognized claim in North Carolina for wrongful discharge based on an alleged discharge in retaliation for opposing discrimination) (emphasis in original).

Claims for wrongful discharge based on reports or complaints by an employee have been recognized, though, in the context of expressions of public policy found in other statutes. See e.g. Gibbons v. Chas. H. Sells, Inc., No. 5:09–CV–448–F, 2010 WL 4695516, at *5 (E.D.N.C. Oct. 22, 2010), memorandum and recommendation adopted, 2010 WL 4695485 (W.D.N.C. Nov. 12, 2010) (claim for wrongful discharge in violation of public policy stated where plaintiff alleged he was terminated for complaining about defendant's purported failure to properly supervise unlicensed personnel in violation of North Carolina licensure statutes applicable to engineers, land surveyors, and landscape architectural services); Lenzer v. Flaherty, 106 N.C.App. 496 (1992) (claim for wrongful discharge in violation of public policy stated where plaintiff alleged she was fired for reporting suspected patient abuse at an Alcohol Rehabilitation Center in violation of N.C.G.S. § 122C–66(b)); Driskell v. Summit Contracting Group, Inc., 325 F.Supp.3d 665, 675 (W.D.N.C. 2018) ("Lenzer indicated there will likely be a wrongful discharge in violation of public policy when an employee is discharged for reporting a violation of a state statute").

### b.  The NPA and Deerman

Plaintiffs argue that the Court should be guided by <u>Deerman v. Beverly California Corporation</u>, 135 N.C.App. 1 (1999), in which the North Carolina Court of Appeals considered the public policy set out in North Carolina's Nursing Practice Act, N.C.G.S. §§ 90-171.19—90-171.47 (the "NPA").

Section 90-171.9 of the NPA provides:

> The General Assembly of North Carolina finds that mandatory licensure of all who engage in the practice of nursing is necessary to ensure minimum standards of competency and to provide the public safe nursing care.

Another portion of the NPA, Section 90-171.21, creates a Board of Nursing which is charged with, among other things, setting minimum standards for educational programs, preparing individuals for licensure, licensing qualified applicants, and overseeing disciplinary action under the NPA. <u>See</u> N.C.G.S. § 90-171.23.

In <u>Deerman</u>, the plaintiff, a registered nurse, was asked by a member of a patient's family for advice regarding the patient's deteriorating condition. The plaintiff advised the family to reconsider their choice of physician and was later terminated for providing that advice. The plaintiff alleged that her termination was "in violation of the strong public policy favoring administering of nursing services to those acutely or chronically ill and the supervising by

nurses of patients during convalescence and rehabilitation." 135 N.C.App. at 3.

In considering whether the plaintiff had stated a claim for wrongful discharge, the North Carolina Court of Appeals began by explaining that the General Assembly had found that the "mandatory licensure of all who engage in the practice of nursing" was "necessary to ensure minimum standards of competency and to provide the public safe nursing care." Deerman, 135 N.C.App. at 6 (citing N.C.G.S. § 90-171.19). Further, the court noted that the NPA created the Board of Nursing with the authority to set minimum standards and oversee disciplinary action. Deerman, 135 N.C.App. at 6 (citing various provisions of the NPA and the Administrative Code). The court thus concluded that the NPA and associated administrative regulations evidenced "a clear public policy in North Carolina to protect public safety and health by maintaining minimum standards of nursing care." Id. at 6.

The Deerman court then considered the specific statutory and regulatory provisions cited by the plaintiff and found, taking her allegations as true and construing them liberally, that she had stated a claim for wrongful discharge. In doing so, the court explained that North Carolina statutes defined "nursing" to include "the caring, counseling, teaching, referring and implementing of prescribed treatment in the prevention and management of illness...," and the "practice of nursing by a registered nurse" to include "[a]ssessing the patient's

19

physical and mental health" and "[p]roviding teaching and counseling about the patient's health care...". <u>Deerman</u> 135 N.C.App. at 7 (citing N.C.G.S. § 90-171.20(4), (7)). Additionally, the court recognized that provisions of the North Carolina Administrative Code placed responsibility on registered nurses to provide guidance to patients and their families, and to make "referrals to appropriate resources." <u>Id</u>. at 8 (citing 21 N.C.A.C. § 36.0224(h)). Accordingly, the court reasoned that the plaintiff's "statements which led to her termination were proffered in fulfillment of her 'teaching and counseling' obligations as a licensed nurse." <u>Deerman</u>, 135 N.C.App at 11.

### 3. The North Carolina Substance Use Disorder Professional Practice Act and Associated Regulations

The SUDPPA established the North Carolina Addictions Specialist Professional Practice Board (the "Board") as the licensing authority for substance use disorder professionals. <u>See</u> N.C.G.S. §§ 90-113.30; 90-113.32. The Board was created specifically:

> in order to safeguard the public health, safety, and welfare, to protect the public from being harmed by unqualified persons, to assure the highest degree of professional care and conduct on the part of credentialed substance use disorder professionals, to provide for the establishment of standards for the education of credentialed substance use disorder professionals, and to ensure the availability of credentialed substance use disorder professional services of high quality to persons in need of these services.

N.C.G.S. § 90-113.30.

That is, similar to the General Assembly's finding, as stated in the NPA, that the "mandatory licensure of all who engage in the practice of nursing is necessary to ensure minimum standards of competency and to provide the public safe nursing care" and its creation of the Board of Nursing to accomplish that objective, the General Assembly enacted the SUDPPA and created the Board, in part, "to safeguard the public health, safety, and welfare," "to protect the public from being harmed by unqualified persons," and "to assure the highest degree of professional care and conduct on the part of credentialed substance use disorder professionals." N.C.G.S. § 90–113.30; see also Wiener v. N. Carolina Substance Abuse Pro. Certification Bd., 169 N.C. App. 256 (2005).

Further, the regulations promulgated under the SUDPPA (like the regulations associated with the NPA), impose certain professional obligations on substance use disorder professionals. The Ethical Principles, for example, provide "a standard for the substance use disorder professional in his or her professional roles, relationships, and responsibilities." 21 N.C.A.C. § 68.0501(b). The Board may deem a violation of the Ethical Principles to be "malpractice, negligence, incompetence, or…conduct that could result in harm or injury to the public, as stated in G.S. 90-113.44(a)(9)." 21 N.C.A.C. § 68.0500(a).

Therefore, the undersigned is persuaded that the SUDPPA and the attendant regulations provide an express North Carolina public policy with regard to substance use disorder professionals.

### 4. The Alleged Basis for Plaintiffs' Termination

Whether the factual allegations in this case adequately state a claim for wrongful discharge in violation of that policy, though, is a separate question, and one that presents a close call. Ultimately, the undersigned is not persuaded that Plaintiffs' allegations are sufficient to support such a claim.

As noted above, a claim for wrongful discharge in violation of public policy is a "very narrow" exception to the employment at will doctrine, Griggs, 2005 WL 1983888 at *12, and a plaintiff seeking to make such a claim must point to a specific expression of public policy that has been violated by his or her termination. Considine, 145 N.C. App. 321-322; see also Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (a federal court "should not create or expand [a] [s]tate's public policy") (first alteration in original) (quotation omitted); see also St. Paul Fire & Marine Ins. Co. v. Jacobson, 48 F.3d 778, 783 (4th Cir. 1995) ("we will not attempt to decide the public policy of the State of Virginia absent a clear and dominant articulation of that policy by the Commonwealth herself").

Here, Plaintiffs cite regulations that require substance use disorder professionals to be competent, ensure client welfare, report unethical conduct to the Board, and assist in eliminating practices by persons who are "unqualified" or "unauthorized" to practice in their field. See 21 N.C.A.C. § 68.0507; 21 N.C.A.C. § 68.0503; 21 N.C.A.C. § 68.0503(e); 21 N.C.A.C. § 68.0503(d). Plaintiffs argue that these regulations required them to report Tewell's conduct to Defendants, and that this report was the basis for their termination.

While the undersigned has taken as true Plaintiffs' factual allegation that their internal reporting of Tewell's conduct was the basis for their termination, Plaintiffs' allegation that they were required by law to make the report is a legal conclusion that is not entitled to the same deference.

Section 503(e) of the Ethical Principles requires substance use professionals to make reports *to the Board*; neither that section nor any other regulation that Plaintiffs have cited specifically requires a substance use disorder professional to report unethical conduct by another professional to a person or entity other than the Board. Though Plaintiffs did report Tewell's conduct to the Board, they do not (and could not) allege that this report was the basis for their termination since it was not made until months after they were discharged by Defendants.

Further, while Section 503(d) requires a substance use disorder professional to assist in eliminating practices by "unqualified" or "unauthorized" persons, Plaintiffs have not alleged specifically that Tewell was "unqualified" or "unauthorized" to practice in the field.

In sum, the plaintiff in <u>Deerman</u> was terminated for fulfilling a professional obligation—teaching and counseling—that was specifically required by North Carolina nursing statutes and regulations. Here, however, the SUDPPA and associated regulations did not specifically require Plaintiffs to report Tewell's conduct, which Plaintiffs believed to be professionally improper, to Defendants. <u>Cf.</u> <u>Deerman</u>, 135 N.C.App. at 12 ("If plaintiff, as alleged, was terminated for meeting the minimum requirements of the practice of nursing as established and mandated by the NPA and regulations thereunder, then such termination violated the public policy of this state to ensure the public a minimum level of safe nursing care").

### B. Intentional Infliction of Emotional Distress

The elements of a claim for intentional infliction of emotional distress are: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." <u>Dickens v. Puryear</u>, 302 N.C. 437, 452 (1981) (citations and quotation marks omitted). To be considered "extreme and outrageous," the conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

24

regarded as atrocious, and utterly intolerable in a civilized community.'" Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 493 (1986) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Whether conduct qualifies as "extreme and outrageous" is a question of law for the court. See e.g., Lenins v. K–Mart Corp., 98 N.C.App. 590, 599 (1990).

"Under North Carolina law, it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to support an IIED claim." Howard v. College of the Albemarle, 262 F.Supp.3d 322, 340 (E.D.N.C. 2017) (collecting cases). "In cases where North Carolina courts have found IIED claims actionable, the conduct has been extremely egregious, and involved sexual advances, obscene language, and inappropriate touching." Bratcher v. Pharmaceutical Product Development, Inc., 545 F.Supp.2d 533, 545 (E.D.N.C. 2008) (collecting cases); cf., Hogan, 79 N.C.App. at 493–94 (finding no extreme or outrageous conduct where a supervisor screamed at employees, called them names, cursed at them, disrupted their work, threw menus at them, refused to grant pregnancy leave, and terminated an employee who left work due to labor pains).

Here, Plaintiffs allege that Defendants "intended to intimidate and harassed" them "by warning them against bringing their complaints against Tewell, which Plaintiffs were obligated to bring under North Carolina law." Doc. 1 at ¶ 57. Plaintiffs additionally allege that they were terminated "based

on the filing of the very complaint that Defendants warned them not to bring."
Id. Plaintiffs contend that "[u]nder the unique factual circumstances" of this
case and "in view of the duties and ethical standards applicable to Defendants"
such conduct was extreme and outrageous. Id. at ¶ 58.

However, even considering Plaintiffs' allegations in the light most
favorable to Plaintiffs, the undersigned is not persuaded that they are
sufficient to state a claim for intentional infliction of emotional distress. See
Jackson v. Blue Dolphin Communications of North Carolina, L.L.C., 226
F.Supp.2d 785, 794 (W.D.N.C. 2002) (finding that defendants' alleged conduct
was not extreme and outrageous under North Carolina law where the plaintiff
alleged that defendants asked her to sign a false affidavit; when she refused,
one of the defendants made a racially discriminatory statement to her; and,
soon afterward, she was dismissed from her position); Thomas v. Northern
Telecom, Inc., 157 F.Supp.2d 627, 635 (M.D.N.C. 2000) (finding that
defendant's alleged conduct was not extreme and outrageous where plaintiff
alleged, among other things, that defendant created a hostile work
environment and discharged her in retaliation for exercising her rights under
Title VII); see also Howard, 262 F.Supp.3d 322 (granting summary judgment
and dismissing IIED claim where the record did not indicate any sexual
harassment, threats of physical or emotional harm, physical contact, obscene
language, or other similar misconduct directed at plaintiff).

## VI.    Recommendation

For the reasons set forth herein, the undersigned respectfully **RECOMMENDS** that Defendants' Motion to Dismiss (Doc. 9) be **GRANTED**, and that Plaintiffs' claims for wrongful discharge in violation of public policy and for intentional infliction of emotional distress be **DISMISSED**.

Signed: December 6, 2022

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636, and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same.

**Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).

28